IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Dawn Marie Chavis,           ) | Civil Action No. 6:13-2914-MGL-KFM |
|         Plaintiff,   ) | |
|                ) | **REPORT OF MAGISTRATE JUDGE** |
|     vs.             ) | |
|                ) | |
| Carolyn W. Colvin, Acting    ) | |
| Commissioner of Social Security,   ) | |
|                ) | |
|         Defendant.   ) | |
|                ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on May 5, 2011, alleging that she became unable to work on August 2, 2006. The applications were denied initially and on reconsideration by the Social Security Administration. On May 14, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and John Black, an impartial vocational expert, appeared on May 8, 2013, considered the case

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

*de novo*, and on June 3, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on August 23, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.
>
> (2)    The claimant has not engaged in substantial gainful activity since August 2, 2006, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: Bipolar Disorder; Post-Traumatic Stress Disorder (PTSD); and, Migraine Headaches (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    Cervical and Lumbar Spine Conditions, a Non-Toxic Thyroid Goiter that was Stable and Controlled with Treatment and Medication, and Mild Right Hip Trochanteric Bursitis are non-severe impairments under the Act and Regulations (20 C.F.R. §§ 404.1520(c) and 416.920(c).
>
> (5)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (6)    The claimant is capable of performing a wide range of Light work with the ability to occasionally lift and/or carry up to 20 pounds as defined in the Dictionary of Occupational Title (D.O.T.) and regulations, as well as, lift/carry 10 pounds frequently. This includes sedentary work as defined in DOT and regulations. She has no limitations for sitting in an eight-hour workday. She is capable of standing and/or walking to up to six hours in an eight-hour workday. She is capable of occasionally climbing ramps/stairs and stooping. She is to perform no crawling, no crouching, no kneeling and no climbing of ladders/ropes/scaffolds. She is to perform no overhead lifting and carrying with the bilateral upper extremities. She is

2

to perform no work that would involve hazardous situations, such as work at unprotected heights or work around dangerous machinery that may cause harm to self or others. She is to perform no commercial driving as part of her job. In the course of work and secondary to headaches, the claimant is to have no exposure to extremes of hot, humidity or cold temperatures. She is to have no exposure to flashing lights or bright lights. Secondary to her mental impairments, she retains the capacity to understand, remember, and carry out simple instructions and perform simple tasks as consistent with unskilled work. In the course of work, she is to have no contact with the public. She is to have only occasional contact with coworkers and supervisors. Contact being defined as occasional coordination and interaction with coworkers and supervisors, although not necessarily proximity to the same. She is to be subject to no mandated production quotas such as producing X product in X amount of time. The claimant is able to perform sustained work activity on a regular and continuous basis for eight hours per day, forty hours per week.

(7)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(8)     The claimant was born on September 20, 1974, and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(9)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(10)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(11)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(12)     The claimant has not been under a disability, as defined in the Social Security Act, from August 2, 2006, through the

3

date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of

4

establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### Medical Evidence

#### Aiken Regional Medical Center

On March 6, 2006, the plaintiff went to the emergency department at the Aiken Regional Medical Center with chest pain. She stated that she had experienced panic attacks before, but this pain was worse (Tr. 279). On August 23, 2009, the plaintiff was treated for pain in her right shoulder, right ankle, and left ring finger (Tr. 288). On February 14, 2010, the plaintiff returned with pain in her head, neck and shoulder. She had a limited range of motion of the left shoulder and left leg after a motor vehicle accident. It was noted that she suffered from depression and anxiety (Tr. 450). On July 3, 2010, the plaintiff was treated for right leg pain after a fall. She had anxiety and a panic disorder, and she was in moderate distress (Tr. 469, 477). On March 13, 2012, the plaintiff was seen for vertigo and a history of anxiety (Tr. 485-487).

#### Family Medical Centers of Aiken

On June 23, 2006, the plaintiff was seen for problems with anxiety. She was tired and reported dizziness. She had been involved in an assault and battery in 2004. She had chest pain and shortness of breath with the panic attacks. The plaintiff was diagnosed with post traumatic stress disorder ("PTSD") and panic disorder and was prescribed Zoloft. She was referred to Aiken Barnwell Mental Health (Tr. 380).

On August 2, 2006, the plaintiff reported a decreased appetite. The Zoloft helped decrease her chest pain, but she was not able to sleep and her mind raced a lot. She was crying at times. Zoloft and Risperdal were prescribed (Tr. 379). On October 4, 2006, the plaintiff was lightheaded and dizzy. She reported fatigue and trouble keeping her balance, causing her to fall sometimes. She was prescribed Klonopin (Tr. 378). On

6

September 22, 2009, the plaintiff was seen for anxiety, migraines, finger pain, and a pain disorder. She was prescribed Paxil (Tr. 373). On February 18, 2010, the plaintiff was in a motor vehicle accident. She had pain in her neck and shoulder. She was prescribed Vicodin for rib and chest pain (Tr. 376). On March 15, 2012, the plaintiff reported right hip pain and was referred to Timothy Shannon, M.D., for bursitis (Tr. 539).

### Combs Chiropractic Care - W. Bradford Combs, D.C.

The plaintiff was seen at Combs Chiropractic from March 3 to April 29, 2010. She had pain in her neck, numbness in her arm and shoulder, headaches, and symptoms of anxiety. She had a decreased lumbar range of motion, and a straight leg raise test was positive on the right (Tr. 321-41). The plaintiff was treated from May 3 to May 27, 2010, for trigger points, neck and upper back pain, and migraines (Tr. 314-19). The plaintiff had seven appointments in June of 2010. She was seen for trigger points, headaches, neck and upper back pain, low back and hip pain, and pain between her shoulder blades (Tr. 307-13). On July 8, 2010, the plaintiff had neck, back, hip, knee, ankle, and leg pain (Tr. 306). On August 6, 2010, the plaintiff had a slightly difficult carriage and gait. Her movement was restricted, and her cervical range of motion was limited. She had pain from her lower spine to her hip (Tr. 304-05). On August 19, 2010, the plaintiff was seen for pain in her sacroiliac ("SI") joint, neck, back, and hip. She had experienced a migraine for three days (Tr. 302). The plaintiff was treated on August 26 and September 1, 2010, for neck, hip, and shoulder pain. She had migraines, and her left upper extremity was numb from her left shoulder to her arm and hand (Tr. 300-01).

### Carolina Musculoskeletal Institute - Timothy J. Shannon, M.D.

On April 27, 2012, the plaintiff saw Dr. Shannon for hip, neck, shoulder, and back pain. She had pain in her right hip that radiated from her hip to the groin area and the right side of her thigh. An x-ray was normal, but she had a varus alignment of her neck, and

the articulo-trochanteric distance was at the low end of normal.  She was given an injection for right greater trochanteric bursitis (Tr. 510-13).

On June 7, 2012, the plaintiff reported that the injection in April did not really help. She received a cortisone injection in a slightly different location.  She was switched from Tramadol to Ultracet, and physical therapy was recommended (Tr. 525).  On July 26, 2012, the plaintiff still had pain in her lumbar spine and on the right great trochanter (Tr. 526).  On October 11, 2012, Dr. Shannon saw the plaintiff for right hip pain.  Exam of the right hip revealed pain with internal rotation.  She was given another injection (Tr. 527).  On October 29, 2012, the plaintiff received another right hip injection (Tr. 530).  On November 29, 2012, she reported only a day or two of relief after the injection.  She was referred to the Medical University of South Carolina ("MUSC") ortho sports area to inquire about arthroscopic hip surgery (Tr. 531).

On January 28, 2013, an MRI of the cervical spine showed degenerative disc disease and facet osteoarthritic changes that resulted in narrowing of the spinal canal at C6-7 and also of the left neural foramina.  There was also neural foraminal narrowing at C5-6.  A lumbar spine MRI showed minimal facet osteoarthritic changes of the lower lumbar spine (Tr. 534, 536).

### St. Cloud Orthopedic Associates

On September 13, 2011, the plaintiff reported right shoulder, hip, and knee pain.  She was diagnosed with right shoulder scapulothoracic dysfunction and pain with concomitant neck pain (Tr. 414-15).  On September 20, 2011, an MRI of the plaintiff's right hip showed trochanteric bursitis.  There was a possible labral tear of her right hip or a sublabral recess of the labrum.  She received an injection of her right hip (Tr. 417-18).

### State Agency Physician

On March 8, 2012, State agency physician Robert Kukla, M.D., reviewed the plaintiff's medical records and concluded that she could lift/carry 25 pounds frequently and

8

50 pounds occasionally; stand, walk, and sit for six hours in an eight-hour day; frequently climb ramps and stairs and balance; and occasionally climb ladders, ropes or scaffolds, stoop, kneel, crouch, and crawl (Tr. 92-94).

***Mental Health Evidence***

### *Aiken Barnwell Mental Health Center*

On September 8, 2006, Gregory E. Smith, M.D., met with the plaintiff. She reported that she had been assaulted in 2004. She was tearful, scared, and anxious to the point where she did not want to go out of her house. Her anxiety caused chest pain. She said that routine was very important to her. She did not want to make contact with people. She was forgetful, and it was difficult for her to concentrate and remember things. She was somewhat hypervigilant. Her concentration and appetite were poor. She did not sleep well. Dr. Smith wrote that the plaintiff was "obviously very, very anxious." She was more and more anxious as she talked about certain things. She was very tearful at times. The plaintiff was diagnosed with PTSD, chronic and with all the associated and expected symptoms. Her Global Assessment of Functioning ("GAF") score was 55.[2] Dr. Smith told her to continue to take Zoloft and Klonopin, but to stop the Risperdal (Tr. 366-68).

On March 6, 2007, the plaintiff was not quite as anxious. She still shook her leg as she sat and talked. She told Dr. Smith that she was getting out of the house more and had decided to start a business. She was selling things at a flea market on weekends along with her husband and also doing bookkeeping and other paperwork at home. Her

---

[2] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Assoc., *Diagnostic & Statistical Manual of Mental Health Disorders* ("DSM-IV") 32-34 (4th ed. 2000). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF schore of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

speech was not as wavering as it had been.  Her GAF score was 60.  She was prescribed Zoloft, Seroquel, and Risperdal (Tr. 363-64).  On September 4, 2007, the plaintiff reported mood swings.  Most of her symptomatic time was described as depression.  During her depressed times, her concentration was not very good, and she did not have any interest in doing things, going places, or being around people. She had more crying spells lately. She did not think Zoloft was helping. The plaintiff was still pretty anxious and kicked her leg and foot during the appointment.  She was fidgety and had a hard time sitting still.  She was diagnosed with PTSD, bipolar disorder, and migraines. She had a GAF score of 55 (Tr. 360-61).

On March 11, 2008, the plaintiff told Dr. Smith that "her mood had actually had been pretty good," but she had a lot of stress due to her financial situation.  She was trying to work with Vocational Rehabilitation Services.  She was tapering off the Risperdal and Zoloft.  Lamictal had worked well until she started being more agitated again.  She was less anxious overall than she had been in the past, but she looked a little nervous and upset. Her dosage of Lamictal was increased.  Dr. Smith assigned a GAF of 60 (Tr. 358-59).  On February 6, 2009, the plaintiff stated that she had being doing well, but she was getting more anxious.  She told Dr. Smith that she had taken trips to see her family in Minnesota and Wisconsin and that these visits had gone well.  For several months prior to the trips, she had been getting out of the house more and had even gone shopping at Wal-Mart.  She was able to do activities at home, but she did not want to go out much.  She was visibly a lot more anxious, wringing her hands and bouncing her legs while she was talking.  She had been talking with someone from Vocational Rehabilitation, but she became so anxious during the interviews that she did not pursue it any further.  Her GAF score was 55, and she was taking Lamictal and Klonopin (Tr. 355-56).

On April 22, 2010, the plaintiff was diagnosed with PTSD and bipolar disorder. She reported that her anxiety attacks had lessened until she was involved in a motor vehicle

accident on February 4, 2010.  After the accident, she felt panicky almost all the time when she had to travel by car (Tr. 352).  She had an increased number of panic attacks in public places.  Sleep and appetite were poor.  She was anxious and had poor insight.  Her affect was restricted (Tr. 347, 352-53).

On June 1, 2010, the plaintiff reported that she had not seen a significant improvement in her anxiety or panic symptoms with addition of the Prozac and Ativan.  She had a great deal of anxiety about leaving the house after a car accident in February.  Her depression was about the same.  She seemed overtly anxious and was shaking her legs and biting her nails (Tr. 495-96).  On July 20, 2010, the plaintiff was anxious and was wringing her hands and shaking her leg.  She stated that Ativan was not really working for her breakthrough anxiety symptoms.  She still had depression and fatigue at times.  She was vague, and it was difficult for her to articulate how she felt.  She requested an increase in her daytime anti-anxiety medications (Tr. 497-98).  On August 19, 2010, the plaintiff was anxious.  She remained seated, her leg jiggled throughout the appointment.  She said she was doing "pretty good."  She was having no adverse effects from medication.  She was continued on Klonopin and Lamictal.  Ativan was discontinued and Buspar was added.  The plaintiff reported that she felt moody.  She had registered for a course in web site design at Aiken Tech, but was feeling a bit anxious.  Her GAF score at this time was 55 (Tr. 349-50).

On February 8, 2012, the plaintiff returned to the mental health center after returning to South Carolina.  She had moved to Minnesota.  She claimed that her condition had worsened in Minnesota and that she had quit taking medications that had been prescribed in the past.  She stated that she had been having more mood swings and her anxiety was worse. She was still having nightmares and some flashbacks.  She had fair judgment and insight, but poor decision making.  She was depressed and reported mood swings.  The record indicates that she had a history of mania in the past.  Mental status

examination findings were essentially normal, and her GAF score at this time was 60. Klonopin, Lamictal and Buspar were prescribed (Tr. 443-44). On March 19, 2012, the plaintiff reported that she had gone to the emergency department with a severe panic attacks. She stated that she was mostly calm while she was at home, but she became anxious when she knew she would have to go out in public. She had some chest pain related to her anxiety (Tr. 502).

On May 17, 2012, the plaintiff had poor judgment and poor insight. She did not leave the house more than once a week. She continued to show a lot of characteristics of borderline personality disorder, which was diagnosed. She continued to isolate herself with little, if any, friends (Tr. 517-18).

On October 25, 2012, the plaintiff' symptoms included crying, racing thoughts, isolating in bed, resurgence of fears of going out and guilt about not being able to overcome her fears (Tr. 546). On November 30, 2012, the plaintiff had poor judgment and insight. Her GAF score was a 60. She had been prescribed Robaxin by her surgeon, which was a strong anti-anxiety medication. She stated that her low had not been this extended for a long time. She had racing thoughts (Tr. 548).

Between December 6, 2012, and January 10, 2013, the plaintiff was anxious and had some depression. Her mind continued to race, and she could not focus enough to read. Her mood had been erratic, she had pain in her hip, and she appeared to be in distress (Tr. 551-57).

On February 1, 2013, the plaintiff's therapist, Kathy Rook, M.A., M.S., wrote that she had been the plaintiff's therapist for a number of years. The plaintiff had the worst case of PTSD that the therapist had ever seen in a civilian. At times, the PTSD made the plaintiff completely non-functional. In one session, the plaintiff ended up sitting on the floor, hugging her knees and crying hysterically. She was inconsolable. The psychiatrist was consulted and prescribed Xanax. The plaintiff also had problems when she tried to go back

12

to school. She sat in the back of the classroom and cried at times. One evening she was unable to go out of the school building and had to call her aunt to come and get her. The therapist stated that the plaintiff's condition was severe and chronic and hoped that disability would be granted (Tr. 537).

### Central MN Mental Health Center

On April 26, 2011, Angela Young, M.S., L.M.F.T., recorded the plaintiff's reported symptoms and diagnosed the plaintiff with a mood disorder and an anxiety disorder. Her GAF score was a 52 (Tr. 397-98). On May 24, 2011, the plaintiff was diagnosed with PTSD and cyclothymic disorder. Her GAF score was 50. Susan A. Mans, RN, increased the dosage of Lamictal and recommended a trial of Gabapentin (Tr. 400-02).

### St. Cloud Medical Group - Lori Edlund, CFNP

On July 18, 2011, the plaintiff was diagnosed with anxiety, bipolar disorder, migraines, and PTSD. She said Prozac made her anxiety worse. She stated she often did not leave the house (Tr. 405-09).

### Julie Humbert, Licensed Social Worker

On October 17, 2011, the plaintiff was diagnosed with PTSD, bipolar disorder, migraines, and she had a GAF score of 50. It was noted that she had a serious and persistent mental illness. The plaintiff requested home-based therapy due to her extreme symptoms of anxiety. Her affect was guarded with an anxious mood, and her concentration was minimal (Tr. 421-22).

### Dennis O. Andersen, MA, LP

On October 26, 2011, the plaintiff was seen for a psychological evaluation in regard to her application for disability benefits. She reported a pattern of chronic worry and anxiety. She maintained reasonable eye contact, but presented with very wiggly and squirmy behavior. Her body was in continuous motion. Mr. Andersen concluded that the plaintiff's attention and concentration appeared to be adequate, but her attempt to complete

13

digit span suggested mild disruption, likely from psychiatric issues. She demonstrated a mild anxiety reaction with recurring panic attacks and a significant amount of social anxiety and avoidance. She continued to experience disruptive mood swings. Her ability to cope with routine environmental or interpersonal stresses appeared limited. When she was faced with difficulty, her anxiety exacerbated notably. The plaintiff was diagnosed with bipolar disorder, PTSD, and anxiety disorder. Her GAF score was 58 (Tr. 426-30).

### State Agency Psychologists

On November 17, 2011, Julian Lev, Ph.D., a State agency psychologist, found the plaintiff retained the capacity to do simple work. Dr. Lev cited the evaluation by Dennis Andersen and one record from Patricia Watkins of Aiken Barnwell Mental Health (Tr. 436-40).

On March 8, 2012, Joyce Lenrow, PsyD, a State agency psychologist, concluded that despite the plaintiff's affective disorder and anxiety disorder, she remained able to do routine, repetitive (3-4 step) work, could handle brief and superficial contact with the public and co-workers, could handle ordinary levels of supervision, and could handle the stress involved in doing routine, repetitive work (Tr. 99-112).

### Plaintiff's Testimony

The plaintiff was divorced. She had one minor child, aged 16. The plaintiff had month to month custody of her daughter, but the daughter had lived with her father during the past school year when the plaintiff lived in Minnesota. Currently, the plaintiff's daughter lived with her father because he had broken his back, and she stayed with him to help him. The plaintiff lived in a house with her daughter, when she was there, and also with the 18-year-old daughter of a friend. The plaintiff had a driver's license and drove to her aunt's house, and her aunt drove the plaintiff to her doctor's appointments. The plaintiff did not go to the grocery store alone. Her aunt drove her to the hearing (Tr. 44-47).

The ALJ noted that the plaintiff had a great work history in 2001 and then again from 2004 to 2006.  Her past work was either cashiering or managerial type work.  She last worked in 2006.  She testified that she stopped working after having a massive panic attack.[3]  She was taken from work in an ambulance, and she did not return.  She believed the stress from the call center portion of her job caused the panic attack.  She had received alimony and currently received child support.  When she worked, she supervised other people in two different jobs, for a total of about six months.  She was a lead worker, she got along with her co-workers, and she got along with the public.

The plaintiff testified that she almost finished college with two degrees.  She tried to go back to school a couple of years prior to the hearing, but she ended up failing because she had panic attacks trying to get to her car from the school.  She had taken an online photography class since 2010. It took her three years to take six classes, completing two each year. Two years prior to the hearing she tried to finish a degree in accounting and business management.  She tried to go to the Department of Vocational and Rehabilitation Services, and she completed a job training course. The  course lasted for a couple of weeks, and she received a certificate of completion (Tr. 47-53).

The plaintiff testified that she vacuumed and swept the floor about once a week, and she mopped every other week. She tried to use public transportation once, but she became too frightened, and her aunt had to provide her transportation.  She cooked simple meals four days per week.  She did not have friends nor use a computer because she did not have the internet.  The "online" class that she took was called online, but they sent her packets in the mail, so she did not really go online or use the computer.  She had a Facebook account on her phone that she used once a week or every other week to check on her daughter's posts.  She did not play video games, go to the movies, go to church or

---

[3]A medical note from September 2006 indicates the plaintiff was recently fired (Tr. 368).

any social organization.  She sometimes went to social or family functions, but she did not stay very long.  She did not have any television reception.  She spent at least eight hours a day reading.  Most of the time she could focus on the story.  She did not have hobbies (Tr. 53-57).

The plaintiff smoked less than one pack of cigarettes a day.  She took her medications, which included Lamictal, Klonopin, Trazodone, Risperdal, Meloxicam, Ultracet, Robasin, and Maxalt for migraines.  She had just started taking the Maxalt the month prior to the hearing, and the medication was helping.  The plaintiff testified that the medications leveled her out, but she would still get really down.  She was treated at the Family Med Center.  She was scheduled to get neck injections, but she was waiting until after her surgery on May 13 to have part of her thyroid removed.  She did not think the thyroid issue had any connection with her mental impairments because the doctors told her the thyroid was releasing the normal amounts of chemicals, but it had lumps on it (Tr. 58-60).

The plaintiff testified that her treating psychiatrist was Dr. Baber, whom she had seen for a little more than a year.  She had been going to mental health providers and taking medications for at least five years.  She felt her anxiety attack in 2006 had been triggered by the call center, but also by an assault that occurred during a robbery. She worked after the assault and required Xanax.  The plaintiff had seen a neurologist for her migraine headaches, but they were unsuccessful in treating them.  Family Med Center had recently prescribed the Maxalt for her migraines.  She had headaches since she was a child.  She had gone to the emergency room for her panic attacks, but she could not remember how long ago it had been.  The plaintiff testified that the reason she could not work was because she had a hard time leaving the house.  Being around people made her anxious.  She had tried to apply for jobs, but she did not make it through the interview (Tr. 62-65).  The plaintiff also had problems with her upper extremities.  Lifting gave her migraines.  In the mornings, her arms were numb, and she had to wait for them to begin to

16

work.  She related this problem to her neck problems.  She had been told to try injections before surgery.  Her arms, right greater than left, went numb about three or four times a week (Tr. 68-70).

***Vocational Expert Testimony***

The ALJ proposed the following hypothetical to the vocational expert:

> Assume an individual with the same age, education and experience as the claimant, who is limited to light work with the ability to occasionally lift and/or carry up to 20 pounds, as well as lift and/or carry 10 pounds frequently.  This would include any sedentary work.  The individual had no limitations for sitting, and is capable of standing and/or walking for up to 6 hours in an 8-hour workday. The individual can occasionally climb ramps or stairs, and can occasionally stoop. The individual could not perform any crawling, crouching, kneeling, or climbing of ladders, ropes or scaffolds. The individual could do no overhead lifting and carrying with the bilateral upper extremities and could perform no work that would involve hazardous situations such as work at unprotected heights or work around dangerous machinery. There would be no commercial driving, no exposure to extremes of hot, humid, or cold temperatures, and no exposure to flashing or bright lights. The individual could understand, remember, and carry out simple instructions and perform simple tasks of unskilled work. The individual would have no contact with the public and only occasional contact with co-workers and supervisors. Contact is defined as occasional coordination and interaction with co-workers and supervisors, but not necessarily proximity to the same. The individual could not be subjected to mandated production quotas such as fast-paced factory work.

(Tr. 74-75).

In response, the vocational expert testified that the individual could not perform the plaintiff's past work.  The vocational expert testified that the hypothetical individual could perform work of a hand bander, 920.687-026, light, specific vocational preparation ("SVP") of 2, with 41,000 jobs nationally and 1,000 jobs regionally; produce sorter, 529.687-010, light, SVP of 2, with 31,000 jobs nationally and 800 jobs regionally; document preparer, 249.587-018, sedentary, SVP of 2, with 49,000 jobs nationally and

1,100 jobs regionally; and surveillance system monitor, 379.367-010, sedentary, SVP of 2, with 28,000 jobs nationally and 900 jobs regionally (Tr. 76-77).

The ALJ asked a second hypothetical, which added the option to sit and to alternate between sitting and standing, but would not cause the individual to be off task. The vocational expert answered that the sorter position, the hand packager position, and the surveillance system monitor would still be possible (Tr. 77). The ALJ asked a third hypothetical, which included a reduction of standing and walking to four hours in an 8-hour day, along with hypotheticals one and two. The vocational expert testified that the individual could perform the jobs of surveillance system monitor or the light positions mentioned earlier because they required minimal, if any, walking. The ALJ asked a fourth hypothetical, which included a reduction of standing and walking to two hours in an 8-hour day. The vocational expert stated that all the jobs would remain, even the light jobs. The ALJ asked a fifth hypothetical, which included being off-task physically for one-third of an 8-hour day. The vocational expert stated that the individual would not be employable (Tr. 77-78). In response to the plaintiff's attorney's question about being out of work for several days a month, the vocational expert answered that anything beyond one to two days per month on a consistent basis would result in the individual not being employable. The attorney asked if the individual were off task 15 to 20 minutes several times a day at unpredictable intervals, due to anxiety issues or other impairments, would the individual be able to maintain sustained employment on a competitive basis. The vocational expert stated that such behavior would not be tolerated in the workplace. The attorney asked the vocational expert if even unskilled jobs required an ability to handle work related stress, and he also asked if all jobs had some level of work-related stress related to minimum performance standards and compliance with expectations of supervisors and things of that nature. The vocational expert answered that was correct (Tr. 78-79).

18

## **ANALYSIS**

The plaintiff was 31 years old on the alleged disability onset date and was 39 years old on the date the ALJ issued her decision (Tr. 186).[4]  She graduated from high school and completed three years of college (Tr. 210).  Subsequently, in 2008, she took certificate courses at a work force center (*id.*).  The plaintiff has worked as a file clerk, customer service representative, salon attendant, personal care attendant, cashier, food service manager, and an assistant manager at a retail store (Tr. 74, 224).  The plaintiff claims that the ALJ erred in (1) failing to properly consider her severe impairments of cervical and lumbar spine conditions and right hip trochanteric bursitis, (2)  failing to properly consider the opinion of therapist Kathy Rook; and (3)  failing to properly evaluate her credibility (pl. brief at 23-38).

### *Severe Impairments*

The plaintiff first argues that the ALJ failed to properly consider her cervical and lumbar spine conditions and right hip trochanteric bursitis (pl. brief at 24-28).  The ALJ specifically considered these conditions and found that they were not severe impairments (Tr. 20-22).  In doing so, the ALJ cited the diagnostic images of the plaintiff's lumbar spine in February 2006 showing normal findings (Tr. 274) and in February 2010 showing no fracture or subluxation of the cervical spine (Tr. 464).  Further, in July 2011, the plaintiff was examined by nurse Lori Edlund who concluded that the plaintiff exhibited signs of good muscle strength in her upper extremities, normal muscle bulk, and intact sensation (Tr. 407-409).  The ALJ also cited medical evidence from a September 2011 examination by Dr. Holien, who concluded that she exhibited signs of mild pain in the interscapular region with tenderness to palpation over the medial border of the scapula along the superior border of the scapula.  He concluded that the plaintiff maintained full spinal range of motion of the

---

[4]The plaintiff was 36 years old on June 30, 2011, the date she was last insured for DIB.

neck (Tr. 413-15).  An MRI in January 2013 revealed minimal degenerative disc disease and facet osteoarthritic changes and minimal narrowing of the spinal canal at the C6-7 and minimal narrowing of the left greater than right neural foramina (Tr. 533-34).  An MRI on the same date also showed minimal facet osteoarthritic changes of the lower lumbar spine and no focal disc protrusions or significant narrowing of the spinal canal or neural foramina (Tr. 535-36).  Based on this evidence, the ALJ concluded that the plaintiff's cervical and lumbar spine conditions were non-severe impairments (Tr. 20-21).

The ALJ also considered the plaintiff's right hip trochanteric bursitis and found that it was a non-severe impairment (Tr. 21-22).  Specifically, the ALJ noted that diagnostic images in February 2006 (Tr. 275) and July 2010 showed a normal pelvis (Tr. 478).  A September 2011 MRI led to the impression of mild trochanteric bursitis, questionable short segment labral tear versus sublabral recess of the anterior acetabular labrum, and no acute or chronic myotendinous injuries (Tr. 416-17).  Also, in January 2012, a physician's assistant noted that the plaintiff walked with a normal gait and was neurovascularly intact (Tr. 531).  The ALJ noted that the plaintiff had an injection of Marcaine in her right hip in October 2012 (Tr. 530), and that Dr. Ray Bauer Vaughters noted upon examination of the plaintiff in March 2013 that she had no neuropathy, no unsteadiness, good posture, and normal gait and station (Tr. 563-64).  Based upon this evidence, the ALJ concluded that the plaintiff's right hip trochanteric bursitis was a non-severe impairment (Tr. 22).

The ALJ also considered a new diagnosis of a non-toxic thyroid goiter and concluded that it was a non-severe impairment (Tr. 21).  The ALJ noted that Dr. Vaughters diagnosed the non-toxic multinodular goiter in March 2013 but found that the plaintiff's complaints were mild, and the condition had no more than a minimal effect on her ability to do basic work activities (Tr. 21; *see* Tr. 563-64).

Based upon the foregoing, the undersigned finds that the ALJ's determination that these impairments were not severe is based upon substantial evidence.

20

The plaintiff also argues that the ALJ failed to consider all of her impairments in combination. When, as here, a claimant has more than one impairment, the ALJ must consider the severe and non-severe impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. §§ 404.1523, 416.923.

The ALJ stated that she considered the entire record (Tr. 17, 19, 25), and the ALJ's findings and analysis show that she considered the plaintiff's impairments in combination. After finding severe impairments at step two, the ALJ specifically made a finding regarding the combined effects of the plaintiff's impairments at step three (Tr. 22-24). *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (taking the ALJ at his word when he stated that he considered all of the claimant's impairments in combination). Further, if an ALJ commits error at step two, it is rendered harmless if "the ALJ considers all impairments, whether severe or not, at later steps." *Robinson v. Colvin*, No. 4:13-cv-823-DCN, 2014 WL 4954709, at *14 (D.S.C. Sept. 29, 2014) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)). Here, in the residual functional capacity ("RFC") assessment, the ALJ found very substantial physical limitations on the plaintiff's ability to work, limiting her to light and sedentary work subject to numerous limitations, including no crawling, crouching, kneeling, or climbing ladders/ropes/scaffolds, no overhead lifting and

carrying, no exposure to work hazards, no commercial driving, no exposure to extremes of temperature or humidity, and no exposure to flashing or bright lights. In addition, she was limited to simple tasks that involved no public contact and only limited interaction with coworkers and supervisors and that did not involve mandated production quotas (Tr. 24). While the plaintiff argues that these impairments "could affect her ability to sit and/or stand and walk for 6 hours in an 8-hour workday" (pl. reply at 7), she has pointed to no evidence or opinion of any qualified medical expert who placed more extensive physical limitations on her than those found by the ALJ. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

Based upon the foregoing and considering the decision as a whole, the undersigned finds no error in this regard. *See, e.g., Simmons v. Astrue*, No. 9:11-02729-CMC-BM, 2013 WL 530471, at *5 n.7 (D.S.C. Feb. 11, 2013) (stating "when considering whether the ALJ properly considered the combined effects of impairments, the decision must be read as a whole"); *Glockner v. Astrue*, No. 0:11-955-CMC-PJG, 2012 WL 4092618, at *4 (D.S.C. Sept. 17, 2012) (finding "that the ALJ sufficiently discussed Plaintiff's alleged impairments and limitations to demonstrate that he considered Plaintiff's impairments in combination").

### Therapist Kathy Rook

The plaintiff next argues that the ALJ failed to properly consider the opinion of her therapist, Kathy Rook (pl. brief at 31-35). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment

22

relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On February 1, 2013, Ms. Rook, a therapist at Aiken-Barnwell Mental Health Center, wrote a letter noting that she had been the plaintiff's therapist "for a number of years" at the state mental health clinic. Ms. Rook stated that the plaintiff had the "worst case" of PTSD she had ever seen in a civilian, which at times made the plaintiff "completely non-functional and in need of assistance" (Tr. 537).

23

The ALJ gave Ms. Rook's opinion little weight, noting that the opinion was inconsistent with Ms. Rook's own notes (Tr. 28). The ALJ further noted that the plaintiff had consistently exhibited clinical signs that were inconsistent with the conclusion that she was "completely non-functional." The ALJ specifically cited treatment notes showing the plaintiff exhibited signs of logical and goal-directed thoughts, no psychosis, no suicidal or homicidal ideation, an affect that was "smiling and appropriate," a mood that seemed to be "quite good," intact attention, concentration, and memory, good judgment, and fair insight (Tr. 28 (citing Tr. 349-51, 355-57,360-62, 363-65)). The ALJ also cited the plaintiff's testimony that she retained the ability to do housework as consistent with the conclusion that she maintained a greater portion of her functionality (Tr. 28).

Importantly, Ms. Rook is not an "acceptable medical source," but an "other source." The regulations define "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "Other sources" who are not "acceptable medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists - such as Ms. Rook. SSR 06-03p, 2006 WL 2329939, at *2. The weight to be given to evidence from other sources "will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors." *Id.* at *4. "[O]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight." *Id.* at *2. The ALJ "generally should explain the weight given to opinions from . . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

24

Here, the ALJ adequately explained the weight given to Ms. Rook's opinion, and substantial evidence supports her finding. While the plaintiff contends that Ms. Rook had long-term familiarity with her condition, the record only contains treatment notes from Ms. Rook from late 2012. As noted by the Commissioner, the plaintiff's treatment notes with Ms. Rook indicate GAF scores of 55, suggesting at most a moderate degree of functional limitations, on October 25, November 1, December 13 and 20, 2012 (Tr. 543, 545, 553, 554). While Ms. Rook's treatment notes from November 8 and 25 and December 6 and 27, 2012, show a GAF of 50 (Tr. 546, 547, 552, 555), indicating serious symptoms, the plaintiff has made no showing that her condition at that time was representative of her condition during the requisite time period, and she has not shown that her condition at that time was likely to persist at the same level for at least twelve continuous months.[5]

The ALJ provided a detailed review of the evidence regarding the course of the plaintiff's mental problems during the entire period at issue (Tr. 26-28), discussed all of the medical opinions of record (Tr. 28-30), and adequately described her reasons for the weight given to each opinion. Notably, the ALJ gave moderate weight to the opinions of the State agency reviewing psychologists Dr. Lev and Dr. Lenrow (Tr. 29-30). Dr. Lev found the plaintiff retained the capacity to do simple work (Tr. 436-40), and Dr. Lenrow concluded that, despite the plaintiff's affective disorder and anxiety disorder, she remained able to do routine, repetitive (3-4 step) work, could handle brief and superficial contact with the public and co-workers, could handle ordinary levels of supervision, and could handle the stress involved in doing routine, repetitive work (Tr. 99-112). See 20 C.F.R. §§ 404.1527(e)(2)(I), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly

---

[5]During this same time period, nursing assessments by Sherry L. Franklin, R.N., of the Aiken-Barnwell Mental Health Center on November 30, 2012, and January 10, 2013, indicate the plaintiff had a GAF of 60 (Tr. 548-51, 556-57). Further, treatment notes by various doctors and nurses at the mental health center from 2006 through 2012 consistently show GAF scores of 55 (Tr. 350, 356, 361, 368), 60 (Tr. 359, 364, 500), and even 65 (Tr. 518, 522), with the exception of one GAF score of 50 in April 2010 (Tr. 353).

qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See also* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir.1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Based upon the foregoing, the undersigned finds no error in this regard.

### Credibility

Lastly, the plaintiff argues that the ALJ failed to properly evaluate her credibility (pl. brief at 35-38).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity

26

> and persistence of the claimant's pain, and the extent to which
> it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> > While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical

27

evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying

28

> flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ discussed the plaintiff's subjective complaints and found that, while her medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (Tr. 25-30).  In evaluating the plaintiff's subjective complaints, the ALJ reviewed the medical evidence over the entire period of time the plaintiff alleged disability and the opinions of medical experts, as well as the plaintiff's activities, the extent to which she sought treatment for certain problems, and her demeanor (*id.*).  The ALJ specifically noted that mental status examinations throughout the medical record showed that the plaintiff retained a "significant portion of her functionality" (Tr. 28); the plaintiff testified that she retained the ability to do various household chores (Tr. 30; *see* Tr. 53-54 (testifying that she vacuums, mops, and sweeps once a week and cooks dinner four times a week)); the plaintiff was able to take online photography classes and study web design after the alleged onset date; the plaintiff was able to sit through a hearing that lasted over an hour without displaying any distress and had good mobility; the plaintiff presented as articulate, coherent, intelligent, with good memory, and responded well to questions; and despite being covered by Medicaid insurance for years, the plaintiff admitted to receiving no treatment from a neurologist for her migraines(Tr. 30).

The plaintiff argues that the ALJ's credibility finding rested primarily on "sit and squirm jurisprudence" (pl. brief at 37).  The undersigned disagrees.  It is permissible for the ALJ to consider, as one factor out of many, his observations at the hearing in the  credibility analysis. *Massey v. Astrue*, No. 3:10-2943-TMC, 2012 WL 909617, at *4 (D.S.C. Mar. 16, 2012) ("As to the sit and squirm observations, the ALJ may not solely base a credibility

determination on his observations at a hearing; however, the ALJ may include these observations in his credibility determination.") (citations omitted); SSR 96-7p, 1996 WL 374186, at *8 (ALJ may consider personal observations of claimant but may not accept or reject the claimant's complaints solely on the basis of such personal observations). Here, the ALJ considered several factors in making her credibility determination.

The plaintiff next argues that the ALJ's consideration of the classes she took was in error because the photography classes did not take much time, and she failed the web design classes at Aiken Tech because of panic attacks (Tr. 49-52). The undersigned sees no error in the ALJ's consideration of these activities as one factor in the credibility analysis.

The plaintiff further argues that the ALJ erred in discounting her credibility based on her failure to see a neurologist for her migraines. The plaintiff points to a treatment note dated September 22, 2009, in which she told a physician at Family MedCenters of Aiken that she had seen a neurologist "before" and had been prescribed Depakote (Tr. 373). The physician at Family MedCenters prescribed Maxalt (*id.*). At the hearing, the plaintiff testified that she saw a neurologist in 2001, and the daily medication he prescribed did not work (Tr. 64). She further testified that it took some time for Medicaid to approve Maxalt, which helped a lot (Tr. 58-59, 64). However, she further testified that she was only prescribed ten pills per month, and she had more migraines than that, and, even with the Maxalt, she still had migraines once or twice a month that resulted in her being in bed for more than two days each (Tr. 67-69). Given the plaintiff's testimony of such debilitating symptoms as a result of her migraines, the undersigned finds that it was not error for the ALJ to find that the plaintiff's lack of treatment by a neurologist weighed against her credibility.

***Residual Functional Capacity***

In a footnote, the plaintiff alleges another error by the ALJ – that the RFC finding that she "can perform no carrying bilaterally" conflicts with the finding that she can perform light work, which requires both frequent and occasional lifting and carrying of certain amounts of weight (pl. brief at 28 n.1). The plaintiff argues that this is an "obvious contradiction," and while she did not have "the space in the brief to cover this argument more thoroughly, . . . the error is straightforward and needs to also be corrected on remand" (*id.*). The undersigned disagrees. The ALJ did not find that the plaintiff could "perform no carrying bilaterally." She found that the plaintiff was "to perform no *overhead* lifting and carrying with the bilateral upper extremities" (Tr. 24) (emphasis added), which does not conflict with the finding that she retained the ability to occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry up to ten pounds. The limitations were included in the hypothetical to the vocational expert, who testified that the hypothetical individual would be able to perform the requirements of several light and sedentary unskilled occupations (Tr. 74-77). Based upon the foregoing, this allegation of error is without merit.

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

December 12, 2014
Greenville, South Carolina

31